IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

UNITED STATES OF AMERICA,      )
                               )
                   Plaintiff,  )
                               )
v.                             )
                               )      No. 3:20-CR-20-KAC-DCP
NATHANIEL TAYLOR,              )
                               )
                   Defendant.  )

## REPORT AND RECOMMENDATION

This case is before the Court, for report and recommendation, on the Defendant's Motion to Suppress [Doc. 16]. *See* 28 U.S.C. § 636(b). On January 21, 2019, Knoxville Police Department ("KPD") Officer Kristin Cox stopped Defendant Nathaniel Taylor's Buick sedan for speeding. Unbeknownst to Officer Cox, Defendant Taylor was on state probation with a condition that his person and vehicle could be searched by any law enforcement officer at any time. During the course of the traffic stop, Officer Cox called for a drug detection dog, after observing what she believed were suspicious circumstances: multiple air fresheners in the car, direction of travel and location seemingly inconsistent with location Defendant claimed to have departed, prior drug convictions, and Defendant's unusual movements inside the vehicle. The drug dog arrived twenty minutes after the initial stop. In preparation for the dog sniff, Officer Cox removed Defendant Taylor from the car and frisked him. The drug dog alerted on the car. As officers began searching his car, Defendant Taylor told Officer Cox that he was on state probation. Defendant Taylor asks the Court to suppress all evidence gained from the traffic stop, the frisk of his person, and the search of his car, all of which he contends violated his rights under the Fourth Amendment.

After reviewing the evidence and arguments of the parties, as well as the relevant law, the Court finds the stop, frisk, and search were constitutional and that the Defendant's motion should be denied.

## I.      POSTIONS OF THE PARTIES

This case arises out of the January 21, 2019 stop of Defendant Taylor's Buick sedan. Based upon evidence seized from the car on that day, Defendant is charged [Doc. 1] with being a felon in possession of a firearm.

Defendant Taylor asks [Docs. 16, 27 & 30] the Court to suppress all evidence gained from the January 21, 2019 traffic stop, including his statements, arguing that the officer's actions violated his rights under the Fourth Amendment to the United States Constitution. First, he argues the traffic stop was unconstitutional because Officer Cox lacked probable cause to believe he was speeding. Second, he asserts that Officer Cox prolonged the stop beyond its lawful purpose and scope without reasonable suspicion of criminal activity. Finally, he contends that Officer Cox unlawfully frisked him, because she did not have a reasonable suspicion that he was armed and dangerous.

The Government responds [Docs. 19, 26, & 31] that the stop and search of the Defendant's car was lawful. It contends that Defendant Taylor waived his Fourth Amendment rights and agreed to a search of his person and vehicle at any time as a condition of his state probation. Alternatively, the Government argues that Officer Cox properly stopped the Defendant for speeding. It maintains that the stop was reasonable in scope and duration, that Officer Cox properly frisked Defendant Taylor for officer safety, and that law enforcement had probable cause to search the car based upon the drug dog's alert.

2

The Defendant responds [Docs. 27 & 30] that Officer Cox did not know his probationary status until after he was removed from the car and officers began to search it. Thus, he contends that the Government cannot rely on his status as a probationer in lieu of probable cause.

The Court held an evidentiary hearing on the Defendant's Motion to Suppress on January 27, 2021. Assistant United States Attorney Alan Scott Kirk appeared on behalf of the Government. Assistant Federal Defender Jonathan A. Moffatt represented Defendant Taylor, who was excused from the hearing. The Court permitted post-hearing briefs, after the filing of the transcript on February 9, 2021. Defendant Taylor filed a post-hearing brief [Doc. 27] on March 1, 2021. The Government submitted a post-hearing brief [Doc. 26] on that same day. Each party filed a responding brief [Docs. 30 & 31] on March 22, 2021. The Court then took the motion and filings under advisement.

## II.    SUMMARY OF TESTIMONY

The Government presented the testimony of KPD Officers Kristen Cox and Brian Mullane.[1] Officer Kristen Cox testified that she has worked for the KPD for ten years, the last three of which have been in the Traffic Services division of the Drug Interdiction Team [Tr. at 5-6]. She stated that her duties are to stop cars and look for drugs or criminal activity [Tr. at 6]. Officer Cox said her patrol car is equipped with a video camera and a moving radar, which captures the speed of vehicles in front and behind her patrol car [Tr. at 6-7]. She stated that the radar is regularly maintained and calibrated [Tr. at 9]. According to Officer Cox, the radar can detect the speed of vehicles approximately twenty (20) yards from her patrol car [Tr. at 9-10].

Officer Cox said that during her time with the KPD, she has issued hundreds of speeding tickets [Tr. at 15]. Her typical actions during a traffic stop are to approach the vehicle; ask for a

---

[1] The transcript [Doc. 25] of the January 27, 2021 evidentiary hearing was filed on February 9, 2021.

3

driver's license, insurance information, and the registration; and ask a couple of questions about the driver's destination and to whom the car belongs [Tr. at 15]. She stated that a typical traffic stop, in which she suspects no other criminal activity, takes ten to fifteen minutes [Tr. at 16]. Officer Cox testified that on January 21, 2019, the KPD had recently switched from a paper ticketing system to an electronic ticketing system [Tr. at 16]. Under the new system, Officer Cox entered the information on her cellular telephone and printed the ticket from a printer in the center console of her patrol car [Tr. at 16]. Officer Cox said she also uses her radio and a computer tablet to check license plate numbers, driver's license numbers, and criminal history during a traffic stop [Tr. at 16-17].

Officer Cox stated that she was on patrol on January 21, 2019, when she saw a white sedan traveling southbound on Interstate 275 ("I-275") [Tr. at 6-7]. She testified that her radar reported the speed of the sedan as sixty-nine (69) miles per hour [Tr. at 11]. The speed limit on that portion of I-275 is fifty-five (55) miles per hour [Tr. at 11-12; Exh. 5]. Officer Cox followed the sedan as it took the fly-over ramp from I-275 south to Interstate 40 ("I-40") east [Tr. at 11]. She stated that, at this point, she was looking for a safe location to stop the sedan for speeding [Tr. at 12]. Officer Cox testified that at approximately 1:46 p.m., she activated her blue lights and stopped the sedan at the Hall of Fame Drive exit [Tr. at 12, 14-15].

The video recording from Officer Cox's in-car camera shows that Officer Cox approached the passenger's side of the car, told the driver that she had stopped him for speeding, and asked for a driver's license [Exh. 3B]. The driver, whom she identified as Nathaniel Taylor, provided his driver's license [Tr. at 17, 21]. Officer Cox testified that when she asked Taylor for his insurance, he opened the glove box and briefly flipped through the papers inside without actually looking through them [Tr. at 17]. She said Taylor also opened the center console and then quickly closed

it, as if he remembered it contained an item he did not want her to see [Tr. at 18]. Officer Cox noticed multiple tree-shaped air fresheners hanging from the gear shift on the steering column [Tr. at 18-19]. She said there were as many as ten air fresheners, the presence of which she said causes her to suspect narcotics [Tr. at 18].

Officer Cox stated that while looking for his insurance information, Taylor told her he had just left an interview at Culver's, which she knew to be a restaurant on Kingston Pike just east of Cedar Bluff Road, approximately twenty minutes west of the location of the stop [Tr. at 19-20; Exh. 3B]. She testified that it seemed odd to her that Taylor claimed to be coming from Culver's, when she had seen him traveling from 640 eastbound to I-275 southbound, rather than taking the most direct route, which would have been I-40 east [Tr. at 19-20]. Approximately three minutes after first stopping Taylor, Officer Cox returned to her patrol car, telling Taylor that if he found his insurance information, either in his car or on his cellular telephone, to hold it up, and she would return to get it [Tr. at 21, Exh. 3B].

Officer Cox said she returned to her patrol car and began checking Taylor's records on her computer [Tr. at 21]. While working on her computer, Officer Cox noticed Taylor make big movements, disappearing from view as if he was reaching toward the back of the car [Tr. at 22]. She said she had asked Taylor to look for his insurance information, so she expected him to make small movements, reaching into the glove box or the center console [Tr. at 22]. The large movements that she saw, instead, "heightened [her] awareness" [Tr. at 22]. Officer Cox said Taylor put his hand out of his window and waived, which indicated to her that he had found his insurance information [Tr. at 22-23]. However, Officer Cox said that after waiving, Taylor again made a large move toward the back of the car [Tr. at 23]. After losing sight of Taylor, Officer Cox testified that she placed her gun on her thigh for her own safety [Tr. at 23]. At that time, she

received information on Taylor's criminal history from the dispatcher, who related that Taylor's prior convictions included aggravated battery and narcotics, as well as a weapons charge [Tr. at 23]. Officer Cox stated that this criminal history added to her suspicions [Tr. at 23].

Officer Cox testified that she returned to Taylor's car, and Taylor handed her an insurance bill, which did not contain his name or information on the effective dates and whether it applied to the Buick [Tr. at 21, 24]. Before returning to her patrol car, Officer Cox asked Taylor to stop "digging around" in his car, because he was making her nervous [Tr. at 24, Exh. 3B].

Officer Cox testified that upon her return to her patrol car, she decided to request a K-9 unit, because her suspicions had been aroused [Tr. at 24]. Using her cellular telephone, she called her partner, Officer James Wilson, who was with K-9 Officer Brian Mullane [Tr. at 24-25]. Officer Cox said she explained her suspicions to Officer Wilson, and he and Officer Mullane responded to the scene of the traffic stop [Tr. at 25]. After speaking to Officer Wilson on her cellphone, Officer Cox radioed for a K-9 unit, to alert the supervisor that she was asking for the unit to report to a different district and assist her [Tr. at 25-26]. Officer Cox said she then began entering the information for the ticket [Tr. at 26]. She recalled that she was having trouble with the new electronic ticketing system on that afternoon and received an error message before she could print the ticket [Tr. at 26]. She estimated she had been using the electronic ticketing system for one week at that time and that it took approximately four minutes to enter the data and print the ticket when she did not get an error message [Tr. at 27].

Officer Cox stated that Officers Mullane and Wilson arrived at the scene of the traffic stop, and she gave them a summary of the situation [Tr. at 28]. Prior to the dog sniff, Officer Cox had Taylor exit the car, and she patted him down for weapons [Tr. at 29]. She stated that she did not find weapons or anything suspicious on Taylor's person [Tr. at 29-30]. Officer Cox identified her

6

police report relating to the stop [Tr. at 30, Exh. 1]. She stated that the narrative portion of the report lists Officer Baldwin as the K-9 officer on the scene [Tr. at 31]. Officer Cox said this is a mistake and that both K-9 Officers Baldwin and Mallone have the first name Brian [Tr. at 31-32]. She stated that a Property Inventory Report, which is attached to her police report, lists the items seized from Defendant's car [Tr. at 32, Exh. 1].

On cross-examination, Officer Cox testified that at the time of the January 21, 2019 stop, she had worked on the Traffic Services Division of the Drug Interdiction Unit for two years [Tr. at 33]. She agreed that she is trained to make traffic stops with the intent to investigate drug trafficking [Tr. at 34]. Officer Cox estimated that she writes between thirty and fifty traffic tickets monthly or one to two tickets daily [Tr. at 35]. She said she is trained to watch human behavior, rather than to look for specific types of vehicles to stop [Tr. at 36]. She agreed that when she first saw Taylor's car, he entered the interstate from 640, which is a bypass around Knoxville [Tr. at 37]. She agreed Taylor could have been coming from West Knoxville [Tr. at 37]. Officer Cox testified that her radar is not hooked up to her in-car camera system [Tr. at 38].

Officer Cox agreed that after she activated her blue lights, the Defendant stopped at the next exit, which was the Hall of Fame Drive exit [Tr. at 38]. She agreed that Defendant told her he was coming from a job interview at Culver's [Tr. at 44]. Officer Cox also agreed that Taylor did not mention where he was going, and she did not know where he was headed [Tr. at 44-45]. She acknowledged that the address on Taylor's driver's license, Chickamauga Road, is in East Knoxville and within several miles of the traffic stop [Tr. at 46-47].

Officer Cox agreed that she asked Taylor to look for his insurance information and gave him an incentive to find it by stating she would not issue a ticket for an uninsured vehicle if he found it [Tr. at 39, 43]. Officer Cox said Defendant's car contained a lot of items in the glove box

[Tr. at 39]. Looking at photographs of Defendant's car taken after the search, she agreed that there were papers in the in the right door and documents and mail on the back seat [Tr. at 41; Exhs. 6-7]. She agreed there were between five and ten air fresheners hanging from the gear shift [Tr. at 42-43]. Officer Cox acknowledged air fresheners like the ones in Defendant's car are readily available at many retail locations [Tr. at 43].

Officer Cox stated that after she returned to her patrol car, she checked Taylors's driver's license with the dispatcher for his local criminal history [Tr. at 47-48]. She agreed that less than one minute later, Taylor waived to her from his car [Tr. at 48]. Officer Cox acknowledged that thereafter, at 13:52:56 on the video, Taylor's head disappeared from view [Tr. at 49]. She agreed that she did not tell Taylor to look for his insurance information in a specific place in his car and that he could have found the insurance paper anywhere in the car [Tr. at 49, 53]. She agreed that at 13:52:06 on the video, Taylor was holding a paper outside of his car [Tr. at 49]. At 13:52:58 on the video, Officer Cox received the report of Taylor's criminal record from the dispatcher [Tr. at 50]. Officer Cox stated that when she approached the car the second time, her gun was in her holster, not in her hand [Tr. at 50-51]. She agreed that she told Taylor "awesome" and that he was "good," because he had a paper to show her [Tr. at 51]. She also agreed that just before 13:55:42 on the video, she asked Taylor to stop digging around in his car but also told him he was doing what she had asked him to do [Tr. at 51]. She did not ask him to get out of the car or threaten to take him into custody for officer safety [Tr. at 51]. She explained that, given her small stature, her approach when working alone was to keep people calm [Tr. at 51-52]. She said when the dispatcher checked in with her, she responded with "Code J," which means she was not in danger and did not need immediate assistance [Tr. at 52].

8

Officer Cox testified that her partner Officer Wilson also had been on the Drug Interdiction Unit for two years and had been an officer for fifteen or sixteen years [Tr. at 54]. She agreed that at 13:57:12 on the video, she told Officer Wilson that she would like to have a drug dog [Tr. at 54]. She acknowledged that while she was talking with Officer Wilson about needing a drug dog, she was not working on the traffic ticket [Tr. at 55]. She agreed that her assessment that the Defendant had passed up his exit to go home was a hunch or a theory, because she did not know that he was going home [Tr. at 55]. She told Officer Wilson that Defendant was not nervous and that she did not smell drugs [Tr. at 55]. She agreed that there was not an east-side K-9 unit available, so she had to get a K-9 unit from the west side [Tr. at 56]. She agreed that she did not mention Defendant's unusual movements within the vehicle to Officer Wilson [Tr. at 58]. At 13:59:45 on the video, Officer Cox ended her call with Officer Wilson, stating that she was going to call for a drug dog [Tr. at 56]. She agreed that when she subsequently radioed for a K-9 unit, she was not working on the traffic ticket [Tr. at 56].

Officer Cox stated that at 14:00:26 on the video, she was working on the traffic ticket and waiting for the K-9 unit [Tr.at 56-57]. She agreed that she could have written a paper ticket, which would take less than two minutes, if she was having problems with the computer [Tr. at 57-58]. Officer Cox stated that by 14:06:28 on the video, Officer Mullane had arrived on the scene [Tr. at 59]. She agreed that she asked Officer Mullane if Officer Wilson had told him about Taylor [Tr. at 59]. She told Officer Mullane that Taylor had a history of felonies and that he was not nervous [Tr. at 59-60]. She agreed that she did not mention Taylor's movements within the car to Officer Mullane [Tr. at 60]. Officer Cox acknowledged that when she began talking to Taylor about Culver's again, the drug dog was on the scene and about to begin searching [Tr. at 60]. She stated that she was told that the drug dog alerted on the Buick [Tr. at 60].

Officer Cox testified that, consistent with her police report, she saw Defendant Taylor reach toward the back of the car on two occasions [Tr. at 60-61]. She said the gun was found in the trunk of the Buick, beside an access point from the center of the back seat [Tr. at 61]. Officer Cox stated that Officer Wilson assisted with the search of Taylor's car [Tr. at 61]. She agreed that an officer told her that the officers found a magazine in the glove box, a holster on the floorboard, and the gun in the trunk [Tr. at 62]. She responded that the location of these items revealed the reason Taylor did not want to look through his glove box or center console upon her initial approach [Tr. at 63]. Officer Cox stated that she was not suspicious of a specific crime, but Taylor's odd behaviors led her to believe that criminal activity could potentially exist [Tr. at 64]. She agreed that Taylor's behavior and the presence of the multiple air fresheners gave her an uneasy feeling [Tr. at 64].

On redirect examination, Officer Cox testified that based upon her training and experience as an interdiction officer, multiple air fresheners in a car typically indicate an attempt to cover the odor of marijuana [Tr. at 65]. She said that she has observed this many times in other stops [Tr. at 65]. She affirmed that Taylor volunteered the information that he was coming from Culver's [Tr. at 66]. She said he told her that he was coming from an interview, she asked where, and he responded at Culver's [Tr. at 66]. Officer Cox testified that based on her experience and training as an officer, she will pretend to be ignorant of any suspicion in order to deescalate a situation [Tr. at 66]. She stated that she uses language to keep the situation calm and to not alert the individual that she is suspicious [Tr. at 66-67].

Officer Cox stated that when she first approached the car, Defendant Taylor opened the glove box to look for his insurance paperwork [Tr. at 67]. She said the interior of the glove box was full of papers, and in her opinion, it would be impossible to know if the insurance paperwork

was in the glove box without removing all the papers [Tr. at 67]. She stated that she found it odd that Defendant appeared only to thumb through the pages [Tr. at 67]. She said the Defendant also lifted the cover to the center console and then shut it so fast that he could not have known if what he needed was in there [Tr. at 68]. She estimated that the center console was open for one second [Tr. at 68]. Officer Cox agreed that the Defendant's movements in relation to the glove box and the center console and the presence of multiple air fresheners were not a hunch but, instead, were things she actually saw [Tr. at 69].

Officer Cox said that as a part of her training, she must qualify each year on her service weapon [Tr. at 68]. She said that while sitting in her patrol car and using her depth perception, she could tell when the Defendant was reaching into the back seat [Tr. at 68-69]. Officer Cox agreed that the Defendant's movements inside the car were not merely a hunch but were movements she actually observed [Tr. at 69]. She said that after Defendant was removed from the car, he told her that he was on probation or parole [Tr. at 69].

On recross-examination, Officer Cox testified that she did not know that Defendant was on probation or parole when she decided to call for a drug dog [Tr. at 70]. She said Defendant told her he was on probation or parole before he was handcuffed but after the drug dog alerted on the car [Tr. at 70-71]. Officer Cox agreed that that people can buy air fresheners for reasons other than masking the odor of marijuana [Tr. at 25]. She affirmed that she did not smell marijuana during the stop [Tr. at 72]. Officer Cox agreed that at the time she left Defendant's car the second time, around 13:56 on the video, she knew he did not have any warrants and the traffic stop for speeding was complete with the exception of writing the ticket [Tr. at 73].

The Government also called Officer Brian Michael Mullane, who testified that he has worked for the KPD for fourteen and one-half years and his current assignment is K-9 handler and

patrol officer [Tr. at 74-75]. He said he and his drug detection dog Milan were first certified in April 2016 [Tr. at 76]. At the time of the traffic stop in this case, in January 2019, they had been certified for nearly three years [Tr. at 76].

Officer Mullane said when he arrives at the scene of a traffic stop, he typically speaks with the officer who initiated the stop to learn what is going on and why he was called to the scene [Tr. at 78]. He then gets his dog out and leads him around the car, once the car is empty of occupants [Tr. at 78]. In this case, he and Milan conducted an exterior K-9 drug sniff of the Defendant's car, and Milan alerted to the odor of narcotics by sitting [Tr. at 77]. Officer Mullane said Milan did a "head kick" at the driver's side door seam, indicating he had detected an odor, then bracketed the odor around the door seam, before coming to a "final response" by sitting, when he could not get any closer to the odor [Tr. at 77].

Officer Mullane testified that following Milan's alert, he and Officer Wilson searched the Defendant's car [Tr. at 78]. He said in the center of the backseat was a drop-down armrest, which allowed access to the trunk [Tr. at 79]. Officer Mullane said when he lowered the armrest, he found a Happy Meal box containing a loaded Glock handgun [Tr. at 79]. He said the Happy Meal box was located against the access panel to the trunk from the backseat [Tr. at 81].

On cross-examination, Officer Mullane stated that no part of the interior of the car, which he searched, had to be opened with a key [Tr. at 82]. Officer Mullane acknowledged that, although his report states he found marijuana crumbs in the car, he did not collect or photograph any marijuana crumbs [Tr. at 83]. He agreed that a trained drug dog can detect the lingering odor of marijuana even if the marijuana is no longer there [Tr. at 83]. He agreed that his report states that Milan gave a positive alert [Tr. at 84]. He said the positive alert was possibly due to the untested marijuana crumbs [Tr. at 84].

12

## III.  FINDINGS OF FACT

Based upon the testimony and the exhibits in this case, the Court makes the following factual findings:

On the afternoon of January 21, 2019, KPD Officer Kristin Cox observed a white Buick sedan enter I-275 southbound from the 640 east ramp.  While traveling behind the Buick, Officer Cox's radar recorded that the Buick was traveling at sixty-nine miles per hour.  The speed limit on that section of I-275 was fifty-five miles per hour.  Officer Cox continued to follow the Buick while watching for a safe spot to stop the car.  She activated her emergency lights and stopped the Buick at 1:46 p.m., just after it pulled onto the Hall of Fame exit ramp.

Officer Cox approached the car and asked Nathaniel Taylor, the car's driver and sole occupant, for his driver's license and proof of insurance.  Taylor provided his driver's license, then opened and briefly looked in the glove box but did not go through the papers inside.  He also opened and immediately shut the console.  During this time, Taylor told Officer Cox he was coming from a job interview.  When she asked where he had interviewed, Taylor told her Culver's, which she knew to be a restaurant in West Knoxville.  While Taylor searched for his insurance papers, Officer Cox noticed five to ten air fresheners hanging from the gear shift on the steering column.  Officer Cox told Taylor to continue looking for his insurance, while she went to her patrol car, and to hold his hand out of the car, if he found it.

Three and one-half minutes into the stop, Officer Cox returned to her patrol car and radioed the dispatcher for a records check on Taylor's driver's license information.  While awaiting the results of the records check, Officer Cox saw Taylor make a large lunging or reaching movement toward the backseat.  Taylor then waived his hand out the opened window, which caused Officer Cox to believe he found proof of insurance.  However, after waiving, Officer Cox saw Taylor

make a second large lunge toward the backseat. The dispatcher then reported to Officer Cox that Taylor had convictions for aggravated battery, narcotics, and weapons.

Seven minutes into the stop, Officer Cox returned Taylor's car, and he provided an insurance bill, which did not bear his name or state that it covered the Buick. Officer Cox told Taylor the problems with this paperwork and asks him to stop "digging around" in his car, because it was making her nervous. Nine and one-half minutes into the stop, Officer Cox returned to her patrol car and called her partner Officer James Wilson on her cellular telephone. Officer Cox asked if K-9 Officer Brian Mullane was nearby, discussed her suspicions with Officer Wilson, and told him she was calling for a K-9 team. Thirteen minutes after stopping the Buick, Officer Cox radioed for a K-9 team. She then began entering the information for the speeding ticket into the electronic ticketing system. Officer Cox was not able to print out the speeding ticket due to a malfunction with the system, which occurred just as Officer Wilson and K-9 Officer Mullane arrived on the scene.

Approximately twenty minutes after Officer Cox stopped the Buick, Officer Mullane and his drug detection dog Milan arrived on the scene. Officer Cox briefly reviewed the situation with Officer Mullane. Officer Cox then returned to the Buick, directed Taylor to get out and stand by the open door, frisked him, and moved him to the side of her patrol car. Twenty-one and one-half minutes after the initial stop, Officer Mullane led Milan around the Buick. Milan alerted on the driver's door of the car. While Officer Mullane and Officer James Wilson searched the Buick, Taylor told Officer Cox that he is on probation. Officers Mullane and Wilson found a gun in a fast-food container just inside the trunk of the Buick and next to the flip-down armrest, which allowed access to the trunk from inside the car.

14

## IV.    ANALYSIS

The Fourth Amendment protects citizens against unreasonable searches or seizures.  U.S. Const. amend IV.  Defendant Taylor argues that his rights under the Fourth Amendment were violated (1) because Officer Cox lacked probable cause to stop him for speeding, (2) unlawfully detained him beyond the time necessary to issue a speeding ticket, and (3) frisked his person without a reasonable belief that he was armed or dangerous.  He contends that due to the unlawful stop, detention, and search of his person and car, all evidence seized from his vehicle and any statements to law enforcement must be suppressed.  The Government argues that Defendant waived his Fourth Amendment rights as a condition of his probation and, alternatively, that the stop, frisk, and search were constitutional.  The Court turns first to the effect of Defendant's status as a probationer on the search and then to the issues of probable cause and reasonable suspicion.

### A.  Waiver of Rights as a Condition of Probation

The Government argues that the KPD officers did not need reasonable suspicion or probable cause to search Defendant Taylor's car, because he waived his Fourth Amendment rights as a condition of his state probation.  It asserts that at the time of the traffic stop on January 21, 2019, Defendant Taylor was on state probation with a condition that he "agree[s] to a search, without a warrant, of [his] person, vehicle, property, or place of residence by any Probation/Parole Officer or law enforcement officer, at any time" [Exh. 10].  The Government contends that the KPD officers could lawfully search Defendant's car without any individual suspicion based on the search condition of his probation.  The Government asks the Court to deny the Defendant's suppression motion on this basis.

Defendant contends that his reduced expectation of privacy from the search condition attendant to his probation is not an extinguished expectation of privacy or a complete waiver of all

15

Fourth Amendment protection.[2] Instead, he argues that any search of his person or property must still be reasonable. Defendant maintains that for the search condition to apply, his status as a probationer must be known to the searching officer prior to the search, which was not the case here. Thus, he asks the Court to find the fact that he was on probation and subject to a search condition has no effect on the stop, detention, frisk, and search at issue in this case.

The Court evaluates the reasonableness of a search "by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." *Wyoming v. Houghton*, 526 U.S. 295, 300 (1999). An individual's status as a probationer affects both sides of this balance. *United States v. Knights*, 534 U.S. 112, 119 (2001). A probationer has a diminished expectation of privacy. *Id.* Additionally, the government has a legitimate interest in protecting the public from crime, and probationers are "'more likely than the ordinary citizen to violate the law.'" *Id.* at 120 (quoting *Griffin v. Wisconsin*, 483 U.S. 868, 880 (1987)).

In *United States v. Knights*, the Supreme Court upheld the warrantless search of a probationer's residence, holding that a condition of the defendant's probation, permitting a search at any time by any law enforcement officer, factored into the totality of the circumstances. 534 U.S. at 122. The Court declined to make a distinction between "probationary searches," conducted to ensure the defendant is compliant with the terms of his probation, and "investigatory searches,"

---

[2] In his responding post-hearing brief, Defendant Taylor argues that the Government cannot raise the issue of his condition of probation after Officer Cox testified at the evidentiary hearing [Doc. 30]. However, the Court finds that defense counsel cross-examined Officer Cox about when she learned that Defendant Taylor was on probation [Tr. at 70-71]. Moreover, the Government agrees that Officer Cox did not know that Defendant was on probation until after the search of his car commenced. Accordingly, the Court finds this issue was not raised after the close of proof and the parties are in agreement that Officer Cox did not know Defendant was on probation until after the search of his car began.

16

conducted to investigate a separate crime, observing that it has long held the subjective motivations of the officer are not a part of the Fourth Amendment analysis. *Id.* at 116-17, 122 (citing *Wren v. United States*, 517 U.S. 806, 813 (1996)). Instead, the Court balanced the search condition's intrusion on the defendant's expectation of privacy, which is diminished, with the need to promote a legitimate governmental interest, i.e., the protection of the public from the heightened risk of crimes by probationers, and held that reasonable suspicion, rather than probable cause, was sufficient to conduct a search of the probationer's residence. *Id.* at 119-20. "When an officer has reasonable suspicion that a probationer subject to a search condition is engaged in criminal activity, there is enough likelihood that criminal conduct is occurring that an intrusion on the probationer's significantly diminished privacy interests is reasonable." *Id.* at 121.

Five years after its decision in *Knights*, the Supreme Court revisited the issue of searches of individuals with a diminished expectation of privacy in *Samson v. California*, 547 U.S. 843 (2006). In *Samson*, the Court examined the Fourth Amendment implications of a California law that required parolees to agree to a search without a warrant or "cause." *Id.* at 846. An officer, who knew defendant was on parole and saw him walking on a public street, searched defendant's person, pursuant to the California law, based solely on his status as a parolee, and seized methamphetamine from his pocket. *Id.* at 846-47. The Court observed that "parolees have even fewer expectations of privacy than probationers[.]" *Id.* at 850. "Examining the totality of the circumstances pertaining to petitioner's status as a parolee, . . . including the plain terms of the parole search condition, [the Supreme Court] conclude[d] that petitioner did not have an expectation of privacy that society would recognize as legitimate." *Id.* at 852. The Court balanced this lack of expectation of privacy with the government's "overwhelming interest in supervising parolees because [they] are more likely to commit future criminal offenses." *Id.* at 853 (internal

17

quotation omitted). The Supreme Court held that "the Fourth Amendment does not prohibit a police officer from conducting a *suspicionless* search of a parolee." *Id.* at 857 (emphasis added). However, the Court observed that California's law permitting suspicionless searches of parolees did not give law enforcement "unbridled discretion to conduct searches," because case law interpreting the provision prohibits "arbitrary, capricious or harrassing searches." *Id.* at 856 (internal quotation omitted).

In the instant case, the Government argues that Defendant Taylor waived his Fourth Amendment rights when he knowingly agreed to the search condition, which permits a warrantless search of Defendant's vehicle at any time by law enforcement [Doc. 26, pp.6-7]. Relying on *United States v. Tessier*, the Government argues that Defendant Taylor's search condition permits not only a warrantless search, but also a suspicionless search of his vehicle. 814 F.3d 432 (6th Cir.), *cert. denied,* 137 S. Ct. 333 (2016). In other words, because Defendant knowingly agreed to the search condition, law enforcement may search his vehicle without reasonable suspicion.

In *Tessier*, law enforcement conducted a sting operation in which they searched the homes of all sex offenders, including that of Tessier, a probationer whose conditions of probation included the same search condition that is at issue in the instant case. *Id.* at 433. The appellate court affirmed and adopted the reasoning of the district court, *id.*, which held that a suspicionless search based upon the defendant's assent to the search condition "is a permissible extension of the analysis employed in *Knights* and *Samson*," *United States v. Tessier*, No. 3:13-00077, 2014 WL 4851688, * (M.D. Tenn. Sept. 29, 2014). The district court found that the policy reasons for the reduced expectation of privacy by probationers in *Knights* and the suspicionless search of parolees in *Samson* also support a suspicionless search for probationers. *Id.* at *7-8. The search condition "'further[s] the two primary goals of probation—rehabilitation and protecting society from future

18

criminal violations.'" *Id.* at *7 (quoting *Knights*, 534 U.S. at 119). The district court also found the "governmental interest to be significant," because probationers are more likely to commit crimes than other citizens and probationers have an incentive to hide or quickly get rid of evidence of their crimes, so their probation will not be revoked. *Id.* at *8. Finally, the district court observed that like with parolees, law enforcement's ability to perform a suspicionless search of a probationer helps the probationer "reintegrate[e] . . . into productive society." *Id.* (quoting *Sampson*, 547 U.S. at 854).

However, in all these cases—*Knights, Sampson*, and *Tessier*—the law enforcement officer conducting the search knew the individual was on probation (or parole) and was subject to a search condition. In *Tessier*, the defendant's probation officer accompanied the federal and local officers to the defendant's residence and assisted in the search. 2014 WL4851688, at **2-3. In *Samson*, the Court noted that "an officer would not act reasonably in conducting a suspicionless search absent knowledge that the person stopped for the search is a parolee." 547 U.S. at 856 n.5 (citing *People v. Sanders* 73 P.3d 496, 505-06 (Cal. 2003)); *Id.* at 866 n.7 (Stevens, J., dissenting). "It would necessarily be arbitrary, capricious, and harassing to conduct a suspicionless search of someone without knowledge of the status that renders that person, in the State's judgment, susceptible to such an invasion." *Id.* at 866 n.7 (Stevens, J., dissenting).

Although in *Tessier* our appellate court upheld the suspicionless search of a probationer, suspicionless searches of individuals about whom law enforcement has no knowledge of their probationary status violate the Fourth Amendment. *Muse v. Harper*, No. 3:15-cv-00615, 2017 WL 3633746, *5 (M.D. Tenn. Aug. 4, 2017) (holding that the "Fourth Amendment does not permit harassing searches of parolees; nor does it permit suspicionless searches conducted by officers who do not know at the time that the person is on parole") (collecting cases) (Newbern, M.J.),

19

*report and recommendation adopted by*, 2017 WL 3623745 (M.D. Tenn. Aug. 23, 2017); *United States v. Williams*, 702 F. Supp. 2d 1021, 1030 (N.D. Ill. 2010) (holding the searching officer must have knowledge that the individual was on parole and subject to a search condition); *New v. Perry*, No. 2:07–cv–723, 2009 WL 483341, *9 (S.D. Ohio Feb. 25, 2009) (holding that a probationer's search condition did not justify detention when officers were not aware of the condition).

In the instant case, the parties agree and the Court finds that Officer Cox did not know Defendant Taylor was a probationer subject to a search condition, until after the search of his car had commenced. Accordingly, in this case, the Court finds that Defendant Taylor's probationary search condition is not a factor in Officer Cox's stop, detention, and frisk of Defendant or in law enforcement's search of his car. *See Florida v. J.L.*, 529 U.S. 266, 271 (2000) (holding "[t]he reasonableness of official suspicion must be measured by what the officers knew before they conducted their search"); *United States v. Johnson*, 620 F.3d 685, 696 (6th Cir. 2010) (holding that "reasonable suspicion for a stop cannot be based on events that occur after the defendant is seized"); *United States v. Evans*, 947 F. Supp. 2d 895, 899 (E.D. Tenn. 2013) (finding officers' observation of the gun occurred during a struggle after the defendant was seized and, thus, did not contribute to reasonable suspicion for the seizure). The Court next turns to whether the stop and search of Defendant Taylor were justified under the traditional Fourth Amendment standards of probable cause and reasonable suspicion.

### B. Probable Cause for Traffic Stop

Defendant Taylor argues that Officer Cox did not have probable cause to stop him for speeding on January 21, 2019. He contends that although the officer claims he was traveling at sixty-nine miles per hour in a fifty-five-mile-per-hour zone, the speed limit on a four-lane,

controlled access highway, such as I-275, is seventy miles per hour. Defendant refers the Court to

Tennessee Code Annotated § 55-8-152(c), which provides in pertinent part:

> On all controlled-access highways with four (4) or more lanes, which are designated as being on the state system of highways or the state system of interstate highways, it is unlawful for any person to operate or drive a motor vehicle or a truck at a rate of speed in excess of seventy miles per hour (70 mph).

Defendant acknowledges that the legislature can prescribe different speed limits in certain zones,

but he contends that the record is devoid of evidence that I-275 south is a special speed zone.

Finally, in his post-hearing brief [Doc. 30], Defendant asserts that the record does not corroborate

Officer Cox's testimony that her radar recorded his speed at sixty-nine miles per hour, because her

radar was not connected to the display on her in-car camera.[3]

The Government responds that Officer Cox had probable cause to stop Defendant Taylor's

vehicle for speeding, because her radar showed his speed to be sixty-nine miles per hour in a fifty-

five-mile-per-hour zone. It contends that Tennessee law permits a lower posted speed limit on a

four-lane, controlled-access interstate highway. Tenn. Code Ann. § 55-8-153. It asserts that

Officer Cox's in-car camera captured the posted speed limit as fifty-five miles per hour [Exh. 5]

in the area in which her radar confirmed Defendant's speed as sixty-nine miles per hour.

If an "officer has probable cause to believe that a traffic violation has occurred or was

occurring, the resulting stop is not unlawful and does not violate the Fourth Amendment." *United*

*States v. Ferguson*, 8 F.3d 385, 391 (6th Cir. 1993), *cert. denied*, 513 U.S. 828 (1994). Whether

---

[3] The video from Officer Cox's in-car camera displays information from the patrol car's systems, such as whether the lights are activated, the speed of the patrol car, etc. [Exh. 3, Tr. at 38]. The video contains a box for radar, which is blank [Exh. 3]. Officer Cox explained the discrepancy between the lack of a radar reading on the video and her testimony that her radar was working and recorded Defendant's speed as sixty-nine miles per hour, by stating that her radar is not connected to the in-car camera [Tr. at 38]. She testified that she observed the radar's display of Defendant's speed on the dash of her patrol car just above her own speedometer [Tr. at 9-11].

a traffic stop is an unreasonable seizure in violation of the Fourth Amendment is assessed, like other alleged Fourth Amendment violations, by objectively evaluating the officer's conduct in light of the surrounding circumstances known to the officer. *Id.* at 388; *see Whren v. United States*, 517 U.S. 806, 810 (1996) (holding that "[a]s a general matter, the decision to stop an automobile is reasonable [within the meaning of the Fourth Amendment] where the police have probable cause to believe that a traffic violation has occurred"); *United States v. Townsend*, 305 F.3d 537, 541 (6th Cir. 2002) (holding that "[a] police officer may effect a traffic stop of any motorist for any traffic infraction, even if the officer's true motive is to detect more extensive criminal conduct"). Probable cause is "reasonable grounds for belief supported by less than prima facie proof but more than mere suspicion," *United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990). In other words, probable cause means a substantial chance or likelihood of criminal conduct. *Ferguson*, 8 F.3d at 392 (citing *Illinois v. Gates*, 462 U.S. 213, 244 n.13 (1983)). A stop based on probable cause that a traffic violation has occurred is reasonable, without regard to the subjective motives of the officer. *Whren*, 517 U.S. at 813; *Ferguson*, 8 F.3d at 391.

The Court agrees with the Government that Officer Cox had probable cause to stop Defendant Taylor's Buick for speeding. Officer Cox testified that her radar, which is regularly calibrated and maintained, recorded the Defendant's speed as sixty-nine miles per hour [Tr. at 9, 11]. This testimony is corroborated by Officer Cox's incident report [Exh. 1], in which she states that "defendant was stopped for going 69MPH in a 55MPH zone." Officer Cox testified that she typically writes the incident report immediately after the stop [Tr. at 31].

State law provides that the speed limit on four-lane controlled access highways may be lowered by the department of transportation or by the municipal legislative authority, where "the public safety requires a lower speed limit." Tenn. Code Ann. § 55-8-153(a) & (c). Notice must

be provided of the lower speed limit by posting signs stating the lower speed. Tenn. Code Ann. § 55-8-153(b). In the instant case, Officer Cox's dash camera captured a speed limit sign stating the speed limit is fifty-five miles per hour in the stretch of road in which she determined Defendant was going sixty-nine miles per hour [Exh. 5]. Accordingly, the Court finds Officer Cox had probable cause to conduct the traffic stop.

### C. Scope of Detention

Defendant also argues that Officer Cox detain him beyond the time necessary to issue a speeding ticket without reasonable suspicion of criminal activity. He contends that at the time Officer Cox radioed for a drug dog, all the steps necessary to complete the traffic citation, except for writing the ticket, were complete. Defendant asserts that Officer Cox could not lawfully detain him beyond the two to four minutes necessary to draft the ticket, unless she had reasonable, articulable suspicion that he was engaged in criminal activity. He maintains that because Officer Cox's uneasy feelings did not amount to reasonable suspicion, his detention for an additional nine minutes until the drug dog arrived violates the Fourth Amendment.

A stop "which is reasonable at its inception may violate the Fourth Amendment by virtue of its intolerable intensity and scope." *Terry v. Ohio*, 392 U.S. 1, 18 (1968). Once a court determines that a seizure was proper, it must still assess "whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Id.* at 20. A traffic stop that is "based on probable cause and concededly lawful" can nevertheless "violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005). "Once the purpose of the traffic stop is completed, a motorist cannot be further detained unless something that occurred during the

stop caused the officer to have a reasonable, articulable suspicion that criminal activity was afoot." *United States v. Hill*, 195 F.3d 258, 264 (6th Cir. 1999), *cert. denied*, 528 U.S. 1176 (2000).

There is no set length of time after which a traffic stop becomes per se unreasonable. *United States v. Everett*, 601 F.3d 484, 493 (6th Cir. 2010). In addition to issuing a citation, actions such as "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance" are all typical inquiries incident to a traffic stop. *Rodriguez v. United States*, 575 U.S. 348, 355 (2015). Additionally, "[i]f an officer has a reasonable and articulable suspicion of criminal activity, he may extend the traffic stop long enough to confirm or dispel his suspicions." *United States v. Johnson*, 482 F. App'x 137, 143 (6th Cir. 2012).

In the instant case, the Court finds that approximately twenty minutes elapsed from the time that Officer Cox stopped the Buick to the arrival of the K-9 team. The Court also finds that up until the time that Officer Cox called her partner Officer Wilson to discuss the need for a drug dog, she was diligently performing the tasks necessary to issuing a traffic citation. She obtained Defendant's driver's license, radioed the dispatcher to check his criminal record, and sought proof of insurance. When she reentered her patrol car the second time, all she had left to do was complete the electronic ticket, which she testified took four minutes. The drug dog arrived approximately ten minutes after Officer Cox reentered her patrol car the second time. Thus, the Court finds that the scope of the detention exceeded the time necessary for the traffic stop by approximately six minutes.[4] Accordingly, the Court examines the question of whether Officer Cox had reasonable

---

[4] The Court observes that Office Cox testified that she experienced problems with the electronic ticketing system, when trying to print the Defendant's ticket. The Court finds that even if Officer Cox had written a ticket by hand, after the electronic ticket failed to print, she would have had time to do so before the K-9 team arrived. Although the Court recognizes Defendant may have been detained only a few minutes beyond the time necessary for Officer Cox to create a second

suspicion to detain Defendant Taylor beyond the approximately fifteen minutes necessary for the traffic stop.

Law enforcement may temporarily seize a person or vehicle, i.e., conduct an investigatory or *Terry* stop, if the officer has "reasonable suspicion" of criminal activity stemming from "specific and articulable" facts which the officer knew at the time of the seizure. *Terry*, 392 U.S. at 21–22, 27; *United States v. Bentley*, 29 F.3d 1073, 1075 (6th Cir.) (observing that an officer who "lacks probable cause, but possesses a reasonable and articulable suspicion that a person has been involved in criminal activity, . . . may detain the suspect briefly to investigate the suspicious circumstances"), *cert. denied*, 513 U.S. 1028 (1994). Reasonable suspicion is a quantum of proof that "is considerably less than proof of wrongdoing by a preponderance of the evidence." *United States v. Sokolow*, 490 U.S. 1, 7 (1989). "Reasonable suspicion exists where the officer can articulate specific, particularized facts that amount to more than a 'hunch' that criminal activity may be afoot." *United States v. Bridges*, 626 F. App'x 620, 623 (6th Cir. 2015) (quoting *United States v. Jeter*, 721 F.3d 746, 751 (6th Cir. 2013)), *cert. denied*, 577 U.S. 1112 (2016); *see also Terry*, 392 U.S. at 27 (holding that an investigatory stop must be based on more than the officer's "inchoate and unparticularized suspicion or 'hunch'"). The presence of reasonable suspicion must be evaluated based on the totality of circumstance at the time the officer decided to make the investigatory stop. *Bridges*, 626 F. App'x at 623. Officers may "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information

---

handwritten ticket, there is no de minimis exception to the requirement of reasonable suspicion. *Rodriguez*, 575 U.S. at 356-57 (rejecting Eighth Circuit's determination that the scope of the detention did not violate the Fourth Amendment when it extended only seven to eight minutes beyond the time necessary to write the traffic ticket).

25

available to them." *United States v. Ellis*, 497 F.3d 606, 613 (6th Cir. 2007) (internal citation and quotations omitted).

In the instant case, Officer Cox testified that Taylor's movements within the car, the presence of multiple air fresheners, the seeming inconsistency in his direction and location of travel, and his prior drug conviction caused her to suspect criminal activity. Officer Cox testified that when she asked for proof of insurance, Taylor made a very cursory inspection of the contents of his glove box and opened and immediately shut the center console. She stated that Taylor could not have looked for his insurance paperwork with these movements and that his movements caused her to think he did not want her to see inside the console. Officer Cox saw between five and ten air fresheners hanging from the gear shift inside Defendant's car. She testified that individuals often use multiple air fresheners to disguise the odor of marijuana. Additionally, Officer Cox testified that she believed Taylor's direction of travel to be inconsistent with the most direct route from his purported job interview at Culver's restaurant and his location on I-275 southbound, where she first saw his Buick.

After Officer Cox returned to her patrol car to radio Taylor's driver's license information for a records check, she observed Taylor making large movements toward the back seat. Although she had told him to continue to look for proof of insurance, Officer Cox testified that she expected he would look in the glove box or the center console. Moreover, after she saw Taylor make one large movement toward the backseat, he held his hand out of the window, signaling to her that he had located his insurance paperwork. Then, Officer Cox saw Taylor make another large movement toward the backseat. Finally, Officer Cox testified that the dispatcher informed her that Taylor had a prior drug conviction. Based upon these factors, Officer Cox decided to call for a drug dog. The Court finds that these factors, considered in the aggregate, constituted articulable facts

providing a reasonable suspicion to detain Defendant beyond the time necessary to complete the traffic ticket.

Defendant Taylor discounts the factors upon which Officer Cox relied as innocent behavior, amounting to nothing more than a hunch. Specifically, he argues that Officer Cox told him to look for proof of insurance, which requires moving around in the car. He notes that air fresheners are ubiquitous and that Officer Cox admits she did not smell marijuana. He contends that there was no way for Officer Cox to believe his direction of travel was odd, when she did not know his destination. Finally, he contends that a prior drug conviction, alone, does not provide reasonable suspicion to detain a motorist for a dog sniff. However, the Court observes that "[i]n considering the totality of the circumstances, 'we must determine whether the individual factors, taken as a whole, give rise to reasonable suspicion, even if each individual factor is entirely consistent with innocent behavior when examined separately.'" *United States v. Perez*, 440 F.3d 363, 371 (6th Cir.) (quoting *United States v. Smith*, 263 F.3d 571, 588 (6th Cir. 2001) (additional citation omitted)), *cert. denied,* 549 U.S. 1014 (2006).

Finally, when evaluating whether a crime is afoot, law enforcement officers may draw upon their training and experience "to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *United States v. Shank*, 543 F.3d 309, 315 (6th Cir. 2008) (internal quotation omitted). Officer Cox testified that she had served as a member of the Traffic Services Division of the Drug Interdiction Unit for two years and wrote thirty to fifty traffic tickets monthly. The Court finds that Officer Cox's training and experience allowed her to make inferences from what otherwise seems like innocuous behavior, such as quickly opening and closing the center console and having numerous air fresheners.

Accordingly, the Court finds that Officer Cox had reasonable suspicion to detain Defendant Taylor for approximately six minutes until the arrival of the K-9 team and for an additional two minutes for the dog sniff. The drug dog's alert provided probable cause for the officers to search the Buick. *See United States v. Sharp*, 689 F.3d 616, 618 (6th Cir.) (holding that an alert by a properly trained drug dog establishes probable cause), *cert. denied,* 568 U.S. 1056 (2012). The Court finds both the scope and duration of the detention comports with the Fourth Amendment.

### D. Propriety of Frisk

Finally, Defendant Taylor argues that Officer Cox frisked him without reasonable suspicion that he was armed and dangerous. He contends that a traffic stop does not entitle an officer to conduct a pat down search of the motorist's person, without specific and articulable facts to support a reasonable belief the individual is armed and dangerous. The Government responds that Officer Cox properly frisked Defendant Taylor for her own safety, as well as that of the other officers on the scene and the public.

An officer may frisk an individual for weapons to assure the officer's safety, if a reasonable officer under those circumstances would be justified in believing the person was "armed and dangerous." *Terry*, 392 U.S. at 27; *United States v. Smith*, 594 F.3d 530, 542 (6th Cir. 2010). "[A] frisk for weapons is justified only where specific and articulable facts give a policeman reasonable grounds to believe that an individual is armed and dangerous." *United States v. Bell*, 762 F.2d 495, 497 (6th Cir.), *cert. denied*, 474 U.S. 853 (1985). "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Terry*, 392 U.S. at 27. The presence of specific and articulable facts is determined by examining the totality of the circumstances. *Bell*, 762 F.3d at 499.

In the instant case, the Court finds Officer Cox had a reasonable suspicion that Defendant Taylor could be armed and dangerous. She observed the Defendant making large reaching motions toward the back seat, during which he completely disappeared from view of her in-car camera. Officer Cox testified that these movements caused her to fear for her safety such that she placed her gun on her thigh, while seated in her patrol car awaiting the results of the records check. The dispatcher then reported that Taylor had prior convictions for aggravated battery, drugs, and weapons. The Court finds the Defendant's movements within the car and the report of his prior convictions are specific and articulable facts giving rise to reasonable suspicion to frisk him. *See United States v. Graham*, 483 F.3d 431, 439 (6th Cir. 2007) (holding that the driver's reaching under his seat, as if accessing or hiding a weapon, in combination with an anonymous tip that the driver was armed, gave officer reasonable suspicion that driver was armed and dangerous permitting a *Terry* frisk).

Defendant argues that Officer Cox's subsequent words and actions when she returned to his car to retrieve his insurance information belie any fear for officer safety. He points out that she told him that he was "good" and that he was doing what she told him to do, i.e., looking for his insurance paperwork, when he was moving around in his car. At the suppression hearing, Officer Cox explained these comments as an effort to diffuse the situation and to not alert the Defendant to her suspicions, while she was the sole officer on the scene. The Court finds, in keeping with the Supreme Court's analysis in *Terry*, that Officer Cox did not have to be "absolutely certain" that Defendant was armed to conduct a *Terry* frisk. Instead, she had to have articulable facts that would cause a reasonably prudent person in her situation to believe her safety or that of others was endangered. The Court finds that Defendant Taylor's movements inside of the car in combination with his criminal history, which included weapons convictions, provided the basis for

reasonable suspicion in this case. Accordingly, Officer Cox's frisk of Defendant Taylor for weapons did not violate his rights under the Fourth Amendment.

## V. CONCLUSION

After carefully considering the parties' filings and arguments, the evidence, and the relevant legal authorities, the Court finds the officer properly stopped Defendant for a traffic violation. The Court also finds that the officer had reasonable suspicion to detain Defendant beyond the time necessary to complete the traffic citation and that the detention was reasonable in scope and duration. Finally, the Court finds that the officer had reasonable suspicion to conduct a *Terry* frisk. Because the Court finds the stop, detention, and frisk of the Defendant comport with the Fourth Amendment, the Court respectfully **RECOMMENDS** that the Defendant's Motion to Suppress Evidence [**Doc. 16**] be denied.[5]

Respectfully submitted,

Debra C. Poplin
United States Magistrate Judge

---

[5] Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2) (as amended). Failure to file objections within the time specified waives the right to review by the District Court. Fed. R. Crim. P. 59(b)(2); *see United States v. Branch*, 537 F.3d 582, 587 (6th. Cir. 2008); *see also Thomas v. Arn*, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the required time period waives the right to appeal the District Court's order). The District Court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive, or general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).

30